# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | | |
|---|---|---|
| DENISE S., | ) | No. CV 18-4824-PLA |
| Plaintiff, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| v. | ) ) | |
| ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) ) ) | |
| Defendant. | ) ) | |

## I.

## PROCEEDINGS

Denise S.[1] ("plaintiff") filed this action on May 31, 2018, seeking review of the Commissioner's[2] denial of her application for Disability Insurance Benefits ("DIB"). The parties filed Consents to proceed before a Magistrate Judge on July 19, 2018, and June 24, 2019.

---

[1] In the interest of protecting plaintiff's privacy, this Memorandum Opinion and Order uses plaintiff's (1) first name and last initial, and (2) year of birth in lieu of a complete birth date. See Fed. R. Civ. P. 5.2(c)(2)(B), Local Rule 5.2-1.

[2] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul, the newly-appointed Commissioner of the Social Security Administration, is hereby substituted as the defendant herein.

Pursuant to the Court's Order, the parties filed a Joint Stipulation (alternatively "JS") on May 9, 2019, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

## II.

## BACKGROUND

Plaintiff was born in 1954. [Administrative Record ("AR") at 127.] She has past relevant work experience as a cashier. [Id. at 345, 398.]

On February 27, 2012, plaintiff filed an application for a period of disability and DIB, alleging that she has been unable to work since April 18, 2004. [Id. at 431; see also id. at 127-28.] After her application was denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). [Id. at 492.] A hearing was held on September 10, 2013, at which time plaintiff appeared represented by an attorney, and testified on her own behalf. [Id. at 476-91.] A vocational expert ("VE") also testified. [Id. at 487-91.] On September 19, 2013, the ALJ issued a decision concluding that plaintiff was not under a disability from April 18, 2004, the alleged onset date, through December 31, 2007, the date last insured (alternatively "DLI"). [Id. at 431-36.] Plaintiff requested review of the ALJ's decision by the Appeals Council, which was denied on December 9, 2014. [AR at 440.] Plaintiff filed an action with this Court in case number CV 15-1152-PLA, and on April 4, 2016, this Court remanded the matter. [Id. at 457-71; see also id. at 474 (Appeals Council Remand Order).] On remand before the same ALJ, hearings were held on February 8, 2017 [id. at 418-27], March 7, 2017 [id. at 402-17], and July 21, 2017, at which time plaintiff again appeared represented by an attorney and testified on her own behalf. [Id. at 374-401.] Medical expert ("ME") Richard Cohen, M.D., a psychiatrist, testified at the March 7, 2017, hearing regarding plaintiff's mental health issues [id. at 408-15]; ME Harvey Alpern, M.D., an internist, testified at the July 21, 2017, hearing regarding plaintiff's physical impairments [id. at 377-83]; a VE also testified at the July 21, 2017, hearing. [Id. at 397-401.] On August 14, 2017, the ALJ issued a decision again concluding that plaintiff was not under a disability from April 18, 2004, the alleged onset date, through December 31, 2007, the

date last insured.  [Id. at 337-47.]  At that time, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.984.  This action followed.

### III.

### STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (citation omitted).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld."  Id. (internal quotation marks and citation omitted).  However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)).  The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."  Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

### IV.

### THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at

least twelve months.  Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting 42 U.S.C. § 423(d)(1)(A)).

## A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lounsburry v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006) (citing Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999)). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Lounsburry, 468 F.3d at 1114.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).  If the claimant meets this burden, a prima facie case of disability is established.  Id.  The Commissioner then bears the burden of establishing that the claimant is not disabled because there is other work existing in "significant numbers" in the national or regional economy the claimant can do, either (1) by the testimony of a VE, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P, appendix 2.  Lounsburry, 468 F.3d at 1114.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920;

Lester v. Chater, 81 F.3d 721, 828 n.5 (9th Cir. 1995); Drouin, 966 F.2d at 1257.

**B.     THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of April 18, 2004, through December 31, 2007, her date last insured.[3]  [AR at 340.]  At step two, the ALJ concluded that through the date last insured plaintiff had the severe impairments of degenerative joint disease; degenerative disc disease; small umbilical hernia; history of gastric bypass surgery; gastroesophageal reflux disease ("GERD"); Barrett's syndrome; and anxiety.  [Id.]  At step three, the ALJ determined that through the date last insured plaintiff did not have an impairment or a combination of impairments that met or medically equaled any of the impairments in the Listing.  [Id.]  The ALJ further found that through the date last insured plaintiff retained the residual functional capacity ("RFC")[4] to perform light work as defined in 20 C.F.R. § 404.1567(b),[5] as follows:

> [Can] stand and walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb, balance, stoop, bend, crouch, and crawl; occasional overhead reaching with the right upper extremity; can understand and remember tasks; can sustain concentration and persistence; can socially interact with the general public, co-workers, and supervisors; and can adapt to workplace changes frequently enough to perform unskilled, low stress jobs that require simple instructions.

---

[3]     The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through December 31, 2007.  [AR at 340.]

[4]     RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[5]     "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

[Id. at 341.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that through the date last insured plaintiff was able to perform her past relevant work as a cashier.  [Id. at 345.]  The ALJ made an alternative finding at step five that through the date last insured there were other jobs existing in the national economy that plaintiff could have also performed, including work as a "packager" (Dictionary of Occupational Titles ("DOT") No. 559.687-074), as a "cleaner" (DOT No. 323.687-014), and as an "assembler" (DOT No. 929.587-010).  [AR at 346.]  Accordingly, the ALJ determined that plaintiff was not disabled at any time from the alleged onset date of April 18, 2004, through December 31, 2007, her date last insured.  [Id.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when he:  (1) determined plaintiff could perform other work; (2) failed to find plaintiff's deep vein thrombosis ("DVT") to be a severe impairment at step two of his analysis; (3) rejected plaintiff's subjective symptom testimony; and (4) breached his duty to develop the record.  [JS at 4.]  As set forth below, the Court respectfully disagrees with plaintiff and affirms the decision of the ALJ.

### A.    STEP FIVE

#### 1.    Legal Standard

In determining whether appropriate jobs exist for a claimant, or whether the claimant can perform her past relevant work, the VE generally will refer to the DOT.  See Light v. Social Sec. Admin., 119 F.3d 789, 793 (9th Cir. 1997).  The DOT is usually "the best source for how a job is generally performed."  Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001).  Social Security Ruling ("SSR")[6] 00-4p explicitly requires that the ALJ determine whether the VE's testimony

---

[6]    "SSRs do not have the force of law.  However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference.  We will not defer to SSRs if they are inconsistent with the statute or regulations."  Holohan v. Massanari, 246 F.3d 1195, 1202 (continued...)

deviates from the DOT, and whether there is a reasonable explanation for any deviation.  See SSR 00-4p (stating that an ALJ must inquire whether a VE's testimony regarding "the requirements of a job or occupation" conflicts with the DOT).[7]  The procedural requirements of SSR 00-4p ensure that the record is clear as to why an ALJ relied on a VE's testimony, particularly in cases where the expert's testimony conflicts with the DOT.  Massachi, 486 F.3d at 1153.  In making disability determinations, the ALJ may rely on VE testimony that contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation.  Light, 119 F.3d at 793; Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995); Massachi, 486 F.3d at 1153.  Although evidence provided by a VE "generally should be consistent" with the DOT, "[n]either the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict."  SSR 00-4p.  Thus, an ALJ must first determine whether a conflict exists, and if it does, he must then determine whether the VE's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the DOT.  Id.

_____

[6](...continued)
n.1 (9th Cir. 2001) (citations omitted).

[7]     SSR 00-4p provides in relevant part:

> When a VE . . . provides evidence about the requirements of a job or occupation, the [ALJ] has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. . . .
> . . . .
> If the VE's . . . evidence appears to conflict with the DOT, the [ALJ] will obtain a reasonable explanation for the apparent conflict.
> . . . .
> When vocational evidence provided by a VE . . . is not consistent with information in the DOT, the [ALJ] must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled. The [ALJ] will explain in the determination or decision how he or she resolved the conflict.  The [ALJ] must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p (emphasis added).  SSR 00-4p similarly provides that "[w]hen there is an apparent unresolved conflict between VE . . . evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled."  Id. (emphasis added).

Ninth Circuit law "is clear that a counsel's failure [to raise an issue] does not relieve the ALJ of his express duty to reconcile apparent conflicts through questioning:  'When there is an apparent conflict between the vocational expert's testimony and the DOT -- for example, expert testimony that a claimant can perform an occupation involving DOT requirements that appear more than the claimant can handle -- the ALJ is *required* to reconcile the inconsistency.'" Lamear v. Berryhill, 865 F.3d 1201, 1206 (9th Cir. 2017) (quoting Zavalin v. Colvin, 778 F.3d 842, 846 (9th Cir. 2015)); see also SSR 00-4p; Massachi, 486 F.3d at 1152-53; Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) (ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered, even when the claimant is represented by counsel). Thus, "the fact that Plaintiff's representative did not challenge the VE's testimony as inconsistent with the DOT at the time of the hearing is not conclusive as to whether an apparent conflict exists, nor does it constitute a waiver of the argument."  Gonzales v. Astrue, 2012 WL 2064947, at *4 (E.D. Cal. June 7, 2012) (citing Sims v. Apfel, 530 U.S. 103, 111-12, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000)).

Only after determining whether the testimony of the VE has deviated from the DOT, and whether any deviation is reasonable, can an ALJ properly rely on the VE's testimony as substantial evidence to support a disability determination.  Massachi, 486 F.3d at 1152-54.  As noted by the Ninth Circuit, "[t]he requirement for an ALJ to ask follow up questions is fact-dependent," and "the more obscure the job, the less likely common experience will dictate the result." Lamear, 865 F.3d at 1205 (noting that to avoid unnecessary appeals, "an ALJ should ordinarily ask the VE to explain in some detail why there is no conflict between the DOT and the applicant's RFC").  Evidence sufficient to support a deviation from the DOT may be either specific findings of fact regarding a claimant's ability to perform particular jobs, or inferences drawn from the context of the expert's testimony.  See Light, 119 F.3d at 1435 n.7 (ALJ provided sufficient support for deviation by noting that the VE described characteristics and requirements of jobs in the local area consistent with claimant's RFC); Terry v. Sullivan, 903 F.2d 1273, 1279 (9th Cir. 1990) (ALJ may infer support for deviation where VE's understanding of applicable legal standards is clear from context).

### 2. Analysis

Plaintiff's RFC limits her to occasional overhead reaching with her right upper extremity, and the ALJ's hypotheticals to the VE included this limitation. [AR at 341, 398-99.] Plaintiff contends that there are conflicts between this reaching limitation and the three occupations identified by the VE at step five (packager, cleaner, and assembler), each of which requires "frequent" reaching, i.e., from 1/3 to 2/3 of the time. [JS at 4-6, 7.] She argues that because reaching is described by the Social Security Administration as "extending the hands and arms *in any direction*," which would include overhead reaching, there was a potential conflict between the DOT job descriptions and the VE's testimony that a person with only occasional overhead reaching could perform these jobs.

Defendant submits that plaintiff does not contest the ALJ's step *four* finding that she could perform her past relevant work as a cashier and, therefore, plaintiff's argument regarding the ALJ's step *five* finding is moot. [Id. at 7 & n.2.] Defendant further points out that neither the DOT job descriptions for the three step five occupations, nor common sense understanding of these occupations' "essential, integral, or expected" tasks, would indicate that any overhead reaching would be required, "much less more than occasional overhead reaching." [Id. at 8-9 (citing Gutierrez v. Colvin, 844 F.3d 804, 807 (9th Cir. 2016) (finding that cashiering is a good example of an occupation that requires frequent reaching but for which the frequency or necessity of *overhead* reaching is unlikely and unforeseeable)).]

In the Reply portion of the Joint Stipulation, plaintiff suggests, for the first time, that the ALJ's step four findings are also in conflict with the DOT "with respect to the reaching requirements as well as the limitation to unskilled, low stress [jobs], with simple tasks." [JS at 12 (footnote and citation omitted).] Plaintiff further asserts that her "focus is not solely on the step five findings" and, in a rather convoluted argument, suggests that she had to show that there was error at step five because even if there was conflict at step four, "the error is harmless if there is no error at step five, so the harmfulness stems from the challenged step five findings." [Id. at 11-12.] The Court will not consider an argument made for the first time in a Reply. Because plaintiff did not raise her step four argument in her opening portion of the Joint Stipulation, it is waived. Willens

v. Berryhill, 709 F. App'x 867, 868 (9th Cir. 2017) (declining to consider issue raised for first time in reply brief).  In any event, as previously discussed, the Ninth Circuit has rejected the argument that the cashier occupation requires overhead reaching.  See Gutierrez, 844 F.3d at 807.  Plaintiff provides no evidence that the cashier occupation is inconsistent with her limitation to unskilled, low stress jobs, with simple tasks.  However, even if there was a step four inconsistency, there was no error in the ALJ's step five finding, and any step four error was harmless.  Plaintiff points to no actual or apparent inconsistency between the step five occupations the ALJ found plaintiff able to perform and plaintiff's limitation to occasional overhead reaching.  As in Gutierrez, the Court finds that the DOT descriptions of the tasks involved in these occupations, as well as a common sense understanding of these tasks, suggests that the frequency or necessity of reaching overhead to perform any of these occupations is "unlikely and unforeseeable."  Gutierrez, 844 F.3d at 808.

Remand is not warranted on this issue.


**B.     STEP TWO**

**1.      The Parties' Contentions**

Plaintiff argues that the ALJ erred by "not finding additional impairments" that preceded plaintiff's DLI, specifically his "neglect in assessing [her] deep vein thrombosis at step two" and "the complications stemming from the multiple gastric surgeries."  [JS at 13.]  She further notes that "[p]art of the error is largely intertwined with the ALJ's faulty credibility assessment of [plaintiff], but part of the error arises from the ALJ's neglect in assessing [plaintiff's] deep vein thrombosis at step two."  [Id.]  With respect to her DVT, plaintiff testified that in 2007 her DVT caused her legs to swell, requiring that she "get off them and elevate her legs."  [Id. at 14 (citing AR at 391-92).]  She also notes that her DVT was documented prior to the expiration of her date last insured.  [Id. (citing AR at 199 (a 2004 medical note)).]  She argues, therefore, that the ALJ should have adopted these additional limitations and presented them in his hypotheticals to the VE.  [Id.]  Plaintiff submits that the error was not harmless because the VE testified that there would be no work for an individual with a need to elevate her legs up to two hours in addition to

normal breaks.  [Id.  (citing AR at 400-01).]

Defendant did not address the step two issue.

### 2.    Step Two Legal Standard

At step two of the five-step process, plaintiff has the burden to provide evidence of a medically determinable physical or mental impairment that is severe and that has lasted or can be expected to last for a continuous period of at least twelve months.  Ukolov v. Barnhart, 420 F.3d 1002, 1004-05 (9th Cir. 2005) (citing 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D)); see 20 C.F.R. §§ 404.1508 (effective through March 26, 2017), 404.1509, 404.1520(a)(4)(ii); see generally Bowen v. Yuckert, 482 U.S. 137, 148, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987) (Social Security disability benefits may be denied at step two if claimant does not present evidence of a "medically severe impairment").  This must be "established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms."  20 C.F.R. § 404.1508 (effective through March 26, 2017).  The Commissioner's regulations define "symptoms" as a claimant's own description of her physical or mental impairment.  20 C.F.R. § 404.1528 (effective through March 26, 2017). "Signs," by contrast, "are anatomical, physiological, or psychological abnormalities which can be observed, apart from [the claimant's] statements . . . [,] [and] must be shown by medically acceptable clinical diagnostic techniques."  Id.  Finally, "[l]aboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques."  Id.  A claimant's statements about an impairment (i.e., "symptoms") "are not enough [by themselves] to establish that there is a physical or mental impairment."  Id.

Step two is "a de minimis screening device [used] to dispose of groundless claims."  Smolen, 80 F.3d at 1290.  A "severe" impairment, or combination of impairments, is defined as one that significantly limits physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520.  An impairment or combination of impairments should be found to be "non-severe" only when the evidence establishes merely a slight abnormality that has no more than a minimal effect on an individual's physical or mental ability to do basic work activities.  Yuckert, 482 U.S. at

153-54 & n.11 (Social Security claimants must make "de minimis" showing that impairment interferes with ability to engage in basic work activities) (citations omitted); Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005); see also 20 C.F.R. § 404.1521(a). "Basic work activities" mean the abilities and aptitudes necessary to do most jobs, including "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . ." 20 C.F.R. § 404.1521(b). It also includes mental functions such as the ability to understand, carry out, and remember simple instructions, deal with changes in a routine work setting, use judgment, and respond appropriately to supervisors, coworkers, and usual work situations. See SSR 85-28.

When reviewing an ALJ's findings at step two, the Court "must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the claimant] did not have a medically severe impairment or combination of impairments." Webb, 433 F.3d at 687 (citing Yuckert, 841 F.2d at 306 ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.")).

### 3.    Analysis

With respect to his step two finding, the ALJ specifically noted that there was no evidence in the record that "the other impairments" alleged by plaintiff in her Adult Disability Report (in which plaintiff reported her DVT), "produced disabling limitations prior to the date last insured." [AR at 345.] Indeed, the only record plaintiff cites to in support of her allegations regarding her DVT is a February 29, 2004, emergency department record, which indicated that plaintiff's past medical history included "DVT [left] leg." [JS at 14 (citing AR at 199).] Other than that citation and her subjective symptom testimony, and despite allegedly being afflicted with this condition since at least 2004, plaintiff provides no evidence by way of signs, diagnostic testing, or laboratory findings -- whether pre-DLI or post-DLI -- of her DVT episode, or that reflects any limitations because of it. Furthermore, Dr. Alpern testified that prior to plaintiff's DLI, the records reflect the "[p]resence of a clot on the leg[] with inferior vena cava filter being implanted." [AR at 381; see also id. at 188 (August 2006 treatment note reflecting that an "inferior vena cava filter is evident").]

He also testified, however, that based on all of her medical records at that time, which reflected the gastric bypass surgeries, the umbilical hernia, the DVT, shoulder pain, degenerative joint disease, back pain, and Barrett's esophagitis, plaintiff "more likely than not," had a light RFC of lifting "20 pounds occasionally, 10 pounds frequently, could stand and walk six out of eight hours, occasional postural, occasional overhead with the right shoulder, and that would be it." [Id. at 381.]

Accordingly, the ALJ's determination that plaintiff's DVT was not a severe impairment prior to her DLI was supported by substantial evidence.

Remand is not warranted on this issue.

## C.    SUBJECTIVE SYMPTOM TESTIMONY

### 1.    Legal Standard

Prior to the ALJ's assessment in this case, SSR 16-3p went into effect.  See SSR 16-3p, 2017 WL 5180304 (republished Oct. 25, 2017).[8]  SSR 16-3p supersedes SSR 96-7p, the previous policy governing the evaluation of subjective symptoms.  SSR 16-3p, 2017 WL 5180304, at *2. SSR 16-3p indicates that "we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term."  Id.  Moreover, "[i]n doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character[;] [i]nstead, we will more closely follow our regulatory language regarding symptom evaluation."  Id.; Trevizo, 871 F.3d at 678 n.5.  Thus, the adjudicator "will not assess an individual's overall

---

[8]    SSR 16-3p, originally "effective" on March 28, 2016, was republished on October 25, 2017, with the revision indicating that SSR 16-3p was "applicable [rather than effective] on March 28, 2016."  See 82 Fed. Reg. 49462, 49468 & n.27, 2017 WL 4790249, 4790249 (Oct. 25, 2017); SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).  Other than also updating "citations to reflect [other] revised regulations that became effective on March 27, 2017," the Administration stated that SSR 16-3p "is otherwise unchanged, and provides guidance about how we evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims . . . ."  Id. The Ninth Circuit recently noted that SSR 16-3p is consistent with its prior precedent.  Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (SSR 16-3p "makes clear what [Ninth Circuit] precedent already required").  Thus, while SSR 16-3p eliminated the use of the term "credibility," case law using that term is still instructive in the Court's analysis.

character or truthfulness in the manner typically used during an adversarial court litigation.  The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person."  SSR 16-3p, 2017 WL 5180304, at *11.  The ALJ is instructed to "consider all of the evidence in an individual's record," "to determine how symptoms limit ability to perform work-related activities."  Id. at *2.  The Ninth Circuit also noted that SSR 16-3p "makes clear what our precedent already required:  that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and 'not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.'"  Trevizo, 871 F.3d at 678 n.5 (citing SSR 16-3p).

To determine the extent to which a claimant's symptom testimony must be credited, the Ninth Circuit has "established a two-step analysis."  Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017) (citing Garrison, 759 F.3d at 1014-15).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  Id. (quoting Garrison, 759 F.3d at 1014-15); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)) (internal quotation marks omitted).  If the claimant meets the first test, and the ALJ does not make a "finding of malingering based on affirmative evidence thereof" (Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006)), the ALJ must "evaluate the intensity and persistence of [the] individual's symptoms . . . and determine the extent to which [those] symptoms limit [her] . . . ability to perform work-related activities . . . ."  SSR 16-3p, 2017 WL 5180304, at *4.  In assessing the intensity and persistence of symptoms, the ALJ must consider a claimant's daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication taken to alleviate pain or other symptoms; treatment, other than medication received for relief of pain or other symptoms; any other measures used to relieve pain or other symptoms; and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529; see

also Smolen, 80 F.3d at 1283-84 & n.8; SSR 16-3p, 2017 WL 5180304, at *4 ("[The Commissioner] examine[s] the entire case record, including the objective medical evidence; an individual's statements . . . ; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.").

Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ did not make a finding of malingering, the ALJ's reasons for rejecting a claimant's subjective symptom statements must be specific, clear and convincing. Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015); Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014) (citing Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)); Trevizo, 871 F.3d at 678 (citing Garrison, 759 F.3d at 1014-15); Treichler, 775 F.3d at 1102. "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Burrell, 775 F.3d at 1138 (quoting Lester, 81 F.3d at 834) (quotation marks omitted). The ALJ's findings "'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" Brown-Hunter, 806 F.3d at 493 (quoting Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)). A "reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." Bunnell, 947 F.2d at 346. As such, an "implicit" finding that a plaintiff's testimony is not credible is insufficient. Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per curiam).

In determining whether an individual's symptoms will reduce her corresponding capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner, the ALJ "will consider the consistency of the individual's own statements." SSR 16-3p, 2017 WL 5180304, at *8-9; see also Ghanim v. Colvin, 763 F.3d 1154, 1163-64 (9th Cir. 2014). In doing so, the ALJ "will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances." Id. "If an individual's various statements about the intensity, persistence, and limiting effects of symptoms are consistent with one another and

consistent with the objective medical evidence and other evidence in the record," the ALJ will determine that an individual's symptoms are more likely to reduce her capacities for work-related activities or reduce the abilities to function independently, appropriately, and effectively in an age-appropriate manner. SSR 16-3p, 2017 WL 5180304, at *9. The ALJ will recognize, however, that inconsistencies in an individual's statements made at varying times "does not necessarily mean they are inaccurate," as symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time. Id.

Here, in discounting plaintiff's testimony, the ALJ found the following: (1) plaintiff's subjective complaints were not supported by the objective evidence; (2) plaintiff's daily activities reflect that "she is not as limited as alleged" and her "ability to participate in such activities is inconsistent with her statements concerning the alleged intensity, persistence, and limiting effects of her symptoms; and (3) plaintiff has not "generally received the type of medical treatment one would expect for a totally disabled individual." [AR at 343.]

### 2. Objective Evidence

The ALJ found that plaintiff's "allegations concerning the intensity, persistence and limiting effects of her symptoms" were inconsistent with the medical record and other evidence in the record. [AR at 343.] The ALJ acknowledged that there was evidence in the record reflecting plaintiff's physical issues, including the following: degenerative joint disease; degenerative disc disease; small umbilical hernia; history of gastric bypass surgery; GERD; Barrett's syndrome; complaints of abdominal pain; an August 2006 pelvic CT showing age-related degenerative changes in the low lumbar spine but otherwise a normal pelvic scan; an August 2006 abdominal CT showing a "tiny umbilical hernia"; prior bypass procedure "without evidence of obstruction or extravasation"; prior gall bladder surgery without abnormal biliary dilatation; no bowel obstruction, abscess, or perforation; and no abdominal wall hernia containing bowel. [Id. citations omitted).] He also noted records reflecting plaintiff's complaints of shoulder pain and generalized osteoarthritis, for which she sought emergency room treatment in February 2004, and for which she was discharged with a non-narcotic prescription medication; and a diagnosis of osteoarthritis

in October 2007, but no reports of pain in March 2008, "suggesting no disabling limitations prior to the date last insured." [Id. (citations omitted).] As previously noted, with respect to plaintiff's other alleged impairments, including her DVT, the ALJ determined that there was no evidence that they produced disabling limitations prior to the date last insured, and the additional evidence produced by plaintiff a few days before the hearing did not relate back to before the date last insured. [Id. at 345.]

Plaintiff contends that the ALJ failed to articulate legally sufficient reasons for rejecting plaintiff's subjective symptom testimony, specifically her "complications stemming from the multiple gastric surgeries." [JS at 13.] With respect to those complications, she testified that after her two gastric bypass surgeries she experienced a hernia, as well as the need to use the restroom frequently, and daily esophageal and stomach pain. [Id. at 13-14.] She argues, therefore, that the ALJ should have adopted these additional limitations, as well as the limitations from her DVT as discussed above, and presented them in his hypotheticals to the VE. [Id. at 14.] Plaintiff further states that the ALJ attempted to discredit plaintiff's testimony "via lack of objective medical evidence, activities of daily living, and conservative treatment," but argues that his rationale was not "clearly articulated." [Id. at 13.] She notes that "[e]ven the testifying medical expert had to admit that the objective medical evidence could support" plaintiff's reports. [Id. (citing AR at 382-83).] She suggests, therefore, that her testimony regarding post-surgery hernia; the need to frequently use the restroom; daily esophageal and stomach pain; back pain; treatment for anxiety and depression and three suicide attempts; DVT in 2007; a 2004 right shoulder injury at work; and a 2006 diagnosis with degenerative disc disease; all support a more restrictive RFC. [Id. at 13-14 (citations omitted).] She also suggests that the error was not harmless because the VE testified that there would be no work for an individual with a need to use the restroom "at will," or to elevate her legs up to two hours in addition to normal breaks. [Id. at 14 (citing AR at 400-01).]

Defendant generally argues that plaintiff has alleged extreme symptoms but "did not contemporaneously report those symptoms to her physicians," and her contemporaneous objective tests returned mild results. [Id. at 15.] Defendant notes that in finding the objective medical evidence did not support plaintiff's severe allegations, the ALJ properly relied on the

testimony of Dr. Alpern at the July 2017 hearing, who observed that he did not see neurologic defects that would support the level of pain alleged; and that although the CT scans of plaintiff's abdomen revealed a "tiny umbilical hernia" and some evidence of "degenerative changes of the lumbar spine," beyond that there was essentially no other evidence supporting plaintiff's allegations between 2004 and 2007.  [AR at 17.]

While a lack of objective medical evidence supporting a plaintiff's subjective complaints cannot provide the <u>only</u> basis to reject a claimant's subjective symptom testimony (<u>Trevizo</u>, 871 F.3d at 679 (quoting <u>Robbins</u>, 466 F.3d at 883)), it is one factor that an ALJ can consider in evaluating symptom testimony.  <u>See</u> <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor the ALJ must consider in his credibility analysis."); SSR 16-3p, 2017 WL 5180304, at *5 ("objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities for an adult").  "The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence. . . . These findings may be consistent with an individual's statements about symptoms and their functional effects.  However, when the results of tests are not consistent with other evidence in the record, they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record." SSR 16-3p, 2017 WL 5180304, at *5.  As the Ninth Circuit recently held, "an ALJ's 'vague allegation' that a claimant's testimony is 'not consistent with the objective medical evidence,' without any 'specific finding in support' of that conclusion, is insufficient." <u>Treichler</u>, 775 F.3d at 1103 (citation omitted); <u>see</u> <u>Laborin v. Berryhill</u>, 867 F.3d 1151, 1153 (9th Cir. 2017) (ALJ's statement that plaintiff's testimony regarding the intensity, persistence, and limiting effects of his symptoms was not credible to the extent his testimony is "inconsistent with the above residual functional capacity assessment" is an insufficient basis for discrediting testimony).

Here, the ALJ stated his conclusion that plaintiff's testimony concerning the intensity, persistence, and limiting effects of her symptoms was "not entirely consistent with the medical

evidence and other evidence in the record."  [AR at 343.]  He then summarized the evidence as described above and tied it to plaintiff's testimony about her alleged symptoms.  Although plaintiff asserts that even the medical expert "had to admit that the objective medical evidence could support" plaintiff's reports of pain, the ME testified as follows:

Q     [B]ased on the fact that that [gastric bypass] surgery was administered, it is possible that there would be some limitation stemming from it, correct?

A     There may be problems with digestion, problems with bowel function, but they usually . . . appear in the records.  . . . . All sorts of things can happen, but I didn't see them.

Q     If, in fact, an individual has had the surgery more than once . . . , would that increase the probability that there would be some problems from that particular surgery?

A     It would increase the probability, but my answer's still the same.  I didn't see it.

Q     Now with respect to the hernia, would she have had greater limitations with her ability to lift and carry?

A     I don't think so, no.

Q     Now I know you have not seen and reviewed the MRI, however, based on the fact that she had degenerative disc disease, would it be reasonable if a plaintiff has subjective complaints of pain that she might be more limited than your RFC?

A     It's possible, but again, you need an exam that shows neurologic defect, that shows abnormal straight-leg raising, abnormal headaches, and I didn't see that.

Q     Now with respect to Barrett's esophagitis . . . would there be pain stemming from that?

A     There *may be*, yes.

[Id. at 382-83 (emphasis added).]   Thus, the ME actually testified that the objective medical

evidence did *not* support plaintiff's reports about her alleged back pain, and was equivocal about whether there would be pain stemming from her Barrett's esophagitis. Notwithstanding Dr. Alpern's ambiguous testimony, other than citing to her own subjective symptom testimony plaintiff did not point to any evidence in the record corroborating her pain symptoms from Barrett's esophagitis during the relevant time period.

This was a specific, clear and convincing reason for discounting plaintiff's subjective symptom testimony. However, the ALJ's determination to discount plaintiff's subjective symptom testimony for this reason rises or falls with the ALJ's other grounds for discrediting plaintiff's testimony. As seen below, those other grounds are sufficient as well.

### 3.    Conservative Treatment History

The ALJ discounted plaintiff's allegations because she "has not generally received the type of medical treatment one would expect for a totally disabled individual." He noted that she "only took over the counter medication because she did not want to take prescription medication due to concern of addiction. Nonetheless, [she] did not seek other types of treatment other than taking over the counter medications." [Id. at 343.] He also observed that the record revealed "no restrictions recommend[ed] by treating doctors," and "[g]iven [plaintiff's] allegations of disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on [plaintiff] by a treating doctor." [Id.]

Plaintiff states that the ALJ's finding that plaintiff was only treated with over-the-counter medications "is untrue." [JS at 19.] She argues that in addition to her over-the-counter medications, she also had "multiple surgeries for obesity," and "had been admitted to the hospital." [Id. (citing AR at 192, 758).]

Defendant argues that the record reflects that plaintiff sought "some treatment for shoulder pain in 2004 (AR 201), a treatment for stomach issues in 2006 (AR 801), and also in 2006 treatment for insomnia and a history of anxiety (AR 817)." [JS at 18.] Defendant argues that "the longitudinal evidence [that mostly relates to a period that post-dates plaintiff's DLI] reveals very limited and conservative care, and is not consistent with Plaintiff's allegations." [Id.] Additionally,

defendant notes that there is "little evidence that Plaintiff sought consistent treatment for her allegedly disabling symptoms. Further, when she did seek treatment, her progress reports do not reflect that she contemporaneously reported the extreme symptoms she alleged to the ALJ to her physicians." [Id.]  In one instance, plaintiff's physician stated that she was "released without limitations (AR 790)." [Id.]  Although there is some evidence that plaintiff sought treatment for shoulder pain in 2004, had stomach issues in 2006, and experienced insomnia and anxiety in 2006, she was treated only with over-the-counter medication and defendant submits that the ALJ properly found that the longitudinal evidence "reveals very limited and conservative care." [Id.] With respect to the ALJ's consideration of the "overall treatment record, or more accurately lack of treatment," defendant observes that when plaintiff did seek treatment she failed to contemporaneously report these extreme symptoms to her physicians, and none of her treating physicians found that she had any functional limitations due to her conditions. [Id. at 18-19 (citations omitted).]

Plaintiff responds that she has not only received over-the-counter medications, but she has also had "multiple surgeries for obesity," and "been admitted to the hospital." [Id. at 19 (citing AR at 192, 758).]  She argues that her 2006 scans showed degenerative changes in her lumbar spine; there was evidence of prior gastric bypass surgery; she reported to the emergency room with right shoulder pain in 2004; and she received treatment for anxiety and depression, trying multiple medications that were not over-the-counter. [Id. at 19-20 (citations omitted).]  In her Reply, she states for the first time that she has been taking psychotropic medications and receiving outpatient care for her mental health issues since 2005.[9] [Id. at 20.]  She also argues that the ALJ erred in finding that plaintiff's medications were effective in controlling her mental health symptoms, and by "not assessing the most recent records that documented [plaintiff's] longstanding mental health history." [Id. (citing AR at 344, 1181-83).]

An ALJ may properly rely on the fact that only routine and conservative treatment has been prescribed. Johnson, 60 F.3d at 1432.  "Conservative treatment" has been characterized by the

---

[9]    Again, the Court will not consider an argument made for the first time in a Reply.

Ninth Circuit as, for example, "treat[ment] with an *over-the-counter pain medication*" (see, e.g., Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (emphasis added); Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (holding that the ALJ properly considered the plaintiff's use of "conservative treatment including physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset")), or a physician's failure "to prescribe . . . any serious medical treatment for [a claimant's] supposedly excruciating pain." Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999).

Here, plaintiff testified that she did not like to take "pain medication" because after her shoulder surgery, she became addicted to Norco after taking it for three weeks. [AR at 396.] She also testified that her doctors have "offered . . . pain medication for years, but I don't want to take it because I don't want to get addicted." [Id.] Plaintiff did not cite to any records to support any physician's recommendation that she take narcotic pain medication for her allegations of pain.

The fact that plaintiff had two gastric bypass surgeries in the past and was "admitted to the hospital" on one occasion, does not support that her treatment has been anything other than conservative. Indeed, the record plaintiff cites to purportedly reflecting that she was "admitted to the hospital" [id. at 191], appears to be a August 24, 2005, *outpatient* lab report from Ridgecrest Regional Hospital in which the only "abnormal" findings were a low white blood count and low vitamin B12 level. [Id. at 191-93; see also JS at 14 (again stating that she "was also admitted to Ridgecrest hospital in 2005" (citing AR at 191)).] Additionally, plaintiff's arthroscopic shoulder surgery to repair a torn rotator cuff was in June *2012*, well *after* her DLI. [AR at 255-63.] Thus, her hearing testimony that she does not like to take narcotic pain medication because of her "addiction" to Norco after her 2012 shoulder surgery does *not* explain why she was treated only with over-the-counter medications for her alleged symptoms *prior* to her DLI. Indeed, at her pre-DLI treatment visit in 2004 at which she alleged having right shoulder pain "for months," plaintiff was discharged only with a prescription for Celebrex -- a nonsteroidal anti-inflammatory drug and told to "follow up with the orthopedist of her choice for treatment of her chronic pain." [AR at 201; see also https://www.drugs.com (last visited June 24, 2019).]

Accordingly, this was a specific, clear and convincing reason for discounting plaintiff's

subjective symptom testimony.

### 4. Daily Activities

The ALJ found that although plaintiff has pain resulting from her physical condition, "she was not as limited as alleged," in light of her reports "that she was able to drive and also went to the grocery store, with no indication that she needed assistance." [Id. at 343.] He concluded that her "ability to participate in such activities is inconsistent with [her] allegations concerning the alleged intensity, persistence, and limiting effects of his/her symptoms." [Id.]

An ALJ may discredit testimony when a claimant reports participation in everyday activities indicating capacities that are transferable to a work setting. Molina, 674 F.3d at 1113. However, "[e]ven where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Id. (citing Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1225 (9th Cir. 2010); Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009)). "Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." Trevizo, 871 F.3d at 682 (citing Ghanim, 763 F.3d at 1165).

Plaintiff generally contends that the ALJ's rationale, which she deemed to be "not clearly articulated," failed to identify what testimony was not credible and what evidence undermines her complaints. [JS at 13 (citations omitted).] She did not, however, specifically address the ALJ's finding regarding the impact of her daily activities on her subjective symptom testimony -- either in the opening portion of the Joint Stipulation relating to this issue, or in the Reply portion.

Defendant contends that despite plaintiff's allegations "of extreme symptoms during the relevant period," "including an inability to walk for more than one minute, stand for 'just a few minutes,' . . . lift more than five pounds, [and] . . . that if she performed any physical activity, such as household chores, that she would need to rest for three days after," she reported elsewhere activities in excess of those limitations, including driving a car and grocery shopping for at least 20 minutes; additionally, as noted by the ALJ, plaintiff was able to live independently and take care of her own household. [JS at 17-18 (citing AR at 341, 389, 393-95).] Defendant further notes that

the ALJ properly considered plaintiff's "overall treatment record, or more accurately lack of treatment," and properly found little evidence that plaintiff sought consistent treatment for her allegedly disabling symptoms; neither did she report the allegedly extreme symptoms to her treating physicians. [JS at 18.] Defendant argues, therefore, that the ALJ properly found that plaintiff's physical activities suggest greater functionality than she has alleged. [Id.]

As previously noted, the objective medical evidence and the treatment record reflecting that plaintiff did not report her extreme limitations to her treating physicians, simply do not support the degree of limitation alleged by plaintiff prior to her DLI. Although a close call given the sparsity of the ALJ's reasoning, the ALJ's finding that plaintiff's daily activities were inconsistent with her subjective symptom testimony, was, in this case, a legally sufficient reason to discount her testimony.[10]

### 5. Conclusion

Based on the foregoing, in addition to his legally sufficient finding that plaintiff's subjective symptom testimony was not supported by the objective medical evidence, the ALJ provided other clear and convincing reasons for discounting plaintiff's subjective symptom testimony that also were "sufficiently specific" to allow this Court to conclude that the ALJ discounted plaintiff's testimony on permissible grounds and did not arbitrarily discredit her testimony regarding the intensity, persistence, and limiting effects of her impairments. Brown-Hunter, 806 F.3d at 493 (quoting Bunnell, 947 F.2d at 345-46). Remand is not warranted on this issue.

### D. DUTY TO DEVELOP THE RECORD

Plaintiff contends the ALJ breached his duty to develop the record "when he did not rule on objections, did not forward records to a medical expert, and refused to contact a medical expert

---

[10]    Even if the Court determined that this was not a legally sufficient reason for discounting plaintiff's subjective symptom testimony, the ALJ's findings that plaintiff's testimony was not supported by the objective medical evidence, and that her treatment had been conservative, were sufficient reasons alone to discount that testimony.

that was on the notice of hearing." [JS at 21.] Specifically, Dr. Cohen, who testified at the second hearing [AR at 407-13], stated that plaintiff "had a lot of chronic pain syndrome and she 'obviously' has major depressive disorder with multiple suicide attempts." [JS at 21 (citing AR at 407-09).] Plaintiff contends that when the ALJ pointed out plaintiff's date last insured, "Dr. Cohen's testimony changed dramatically," and he "also did not acknowledge [plaintiff] had a suicide attempt in 2003, prior to her DLI." [Id. (citing AR at 413).] Dr. Cohen also purportedly stated that he would need records from the earlier time frame. [Id. (citing AR at 414).] Then, at the third hearing, Dr. Alpern, the physical medical expert was set to testify, but "the ALJ poisoned the well prior to taking medical expert testimony," when he stated that at the previous hearing, "Dr. Cohen testified and that he said 'no records support disability prior to December 31, '07.'"[11] [JS at 22 (citing AR at 376).] The ALJ further stated to Dr. Alpern that even though plaintiff had been on psychological medication, she did not have a severe mental impairment. [Id. (citing AR at 376-77).] Dr. Alpern testified that prior to plaintiff's DLI, she had a gastric bypass, umbilical hernia, clot in her leg, shoulder pain, degenerative joint disease, back pain, and psychological issues. [Id. (citing AR at 381).] When he mentioned psychological issues, the ALJ informed Dr. Alpern that it was the physical impairments "we're interested in." [AR at 381.]

After Dr. Alpern's testimony, plaintiff's counsel asked whether Dr. Cohen would be called for follow-up testimony, as he had been included as a medical expert in the notice of hearing. [Id. (citing AR at 383).] The ALJ stated that he was not going to call Dr. Cohen because Dr. Cohen had already testified at the prior hearing that there were not any medical records supporting psychological problems prior to the DLI. [Id. (citing AR at 383).] Plaintiff's counsel pointed out that Dr. Alpern had "just testified that [plaintiff] had psychological issues" prior to that date. [Id. (citing AR at 383).] The ALJ responded that Dr. Cohen had been indicated on the notice of hearing in error and that he saw no need for him to testify again. [Id. (citing AR at 384).] Plaintiff's counsel

_____

[11]    The ALJ made it clear that at the prior hearing it was psychiatrist Dr. Cohen who testified to the following:  there were "no records [to] support disability prior to December 31, '07.  Even though she was on that psychological med doesn't mean she had severe impairment.  That was pretty much what his testimony was."  [AR at 376-77.]

replied that Dr. Cohen had testified that he had not "really seen anything about [plaintiff's] underlying abuse that triggered a lot of her anxiety issues," and noted that recently submitted records from "Dr. Sharma and also the most recent psychological records really highlight the nature of her abuse as a child and young adult," which gave rise to the psychological symptoms. [Id. at 22-23 (citing AR at 384, 1182).] Plaintiff notes that the recently updated records "revealed a longstanding history of abuse as well as self-mutilation" that "would have likely yielded even more limitations in the RFC." [Id. at 23 (citing AR at 1182).]

Defendant responds that the ALJ "sustained his burden to fully develop the record by obtaining the testimony of two medical experts," and that plaintiff "had the right to cross-examine both experts, and did so." [Id. (citing AR at 377-84, 410-15).] He states that because there was no ambiguous evidence in the record, and the record was adequate to allow for proper evaluation of the evidence, the duty to fully and fairly develop was fulfilled. [Id.] Additionally, defendant notes that "[t]he ALJ has discretion to decide when cross-examination is warranted." [Id. at 24 (citing Copeland v. Bowen, 861 F.2d 536, 539 (9th Cir. 1988)).] Defendant further observes that at the previous hearing, Dr. Cohen stated that there was "very little medical evidence of mental health treatment during the relevant period, or indeed of any mental functional limitations." [Id. (citing AR at 412).] Although plaintiff's counsel pointed Dr. Cohen to some mental health records from October 2007 that reflected she had some mental health treatment and had been prescribed mental health medications, Dr. Cohen testified that "such a prescription would not translate into any significant mental functional limitations." [Id. (citing AR at 412-13, 789).] Thus, plaintiff was not denied the right to cross-examine Dr. Cohen, even if she was not able to cross-examine him a second time. [Id.] Defendant asserts that a claimant is "not entitled to unlimited cross-examination, but is entitled to such cross examination as may be required for a full and true disclosure of the facts." [Id. (quoting Copeland, 861 F.2d at 539 (internal quotation marks omitted) (noting that the ALJ has discretion to decide when cross-examination is warranted)). Moreover, the ALJ "actually gave Plaintiff [the] benefit of the doubt, and found her *more* functionally limited than Dr. Cohen opined." [Id. at 24-25 (citing AR at 345).] Defendant also contends that plaintiff's "alternate theory of the case, relating to childhood trauma," was never raised to any of her

physicians contemporaneous with the relevant period, in her application for benefits, at any of her multiple hearings, or when she did have the opportunity to cross-examine Dr. Cohen.  [Id. at 25.] Thus, the ALJ did not abuse his discretion when he denied plaintiff's request to cross-examine Dr. Cohen a second time.  [Id.]

Plaintiff suggests that Dr. Cohen's own testimony regarding the medical record "triggered the ALJ's duty to re-contact him, forward him additional records, and inquire regarding the severity of any mental impairment," especially because Dr. Cohen testified that if plaintiff "had problems in present day, it might have related back," and stated that he needed to review more records. [Id. (citing AR at 410, 413-14).]  Plaintiff further submits that the newly-produced records "confirmed [plaintiff's] allegations of a long history of abuse and suicidal ideation."  [Id. at 25-26 (citing AR at 1182-83).]  Plaintiff states that "[t]his was significant, as Dr. Cohen stated [plaintiff] definitely satisfied the 'C' criteria of the listing at least in 2012."  [JS at 26 (citing AR at 414-15).]

The Court agrees with defendant that there was no ambiguity in the record to trigger the ALJ's duty to further develop the record by recalling Dr. Cohen to testify a second time.  Indeed, the record reflects that at the second hearing, on cross-examination plaintiff's counsel specifically asked Dr. Cohen whether, based on "the fact that [plaintiff] was subjected to decades of physical and verbal abuse" this would change his opinion about plaintiff's mental state, and Dr. Cohen replied that that fact alone "wouldn't mean that much" [AR at 414], thus implying that even if he had seen the recently-produced records, his opinion would not have changed regarding the relevant period.  Dr. Cohen similarly testified that despite the fact that plaintiff was taking psychotropic medications prior to her DLI, just being on those medications "really means almost zero," and there is nothing in the record to show any psychiatric impairment "that's disabling psychiatrically before 2007."  [AR at 412.]  With respect to plaintiff's suicide attempt in 2003, Dr. Cohen did not fail to acknowledge it as suggested by plaintiff; rather, when plaintiff's counsel questioned Dr. Cohen about the significance of her suicide attempt in 2003, together with her more recent suicide attempts, Dr. Cohen explained that in his experience, he has "actually [had] people have a suicide attempt and then have a suicide attempt, you know, later, and they function in the work environment in between . . . ."  [Id. at 413-14.]  Although Dr. Cohen acknowledged that it

would be helpful to have any psychiatric records from 2003, he also stated that it is "really a stretch" to infer a severe mental impairment between 2004 and 2007 from these facts alone. [Id.] He acknowledged his belief that "there's a possible C criteria after 2012," but explained that "[i]t would be impossible" to "take that back . . . to 2007." [Id. at 415.]

Because the ALJ's duty to further develop the record was not triggered, remand is not warranted on this issue.

## VI.

## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **denied**; and (2) the decision of the Commissioner is **affirmed**.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  June 25, 2019

_____
        PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

28